FILED
2024 Jan-03 PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# **EXHIBIT D**

September 20, 2018

Report of Ethics Oversight Committee Meeting

Committee members present: James Hunter, Wendy Walters, Mariko Nakano, Kevin Riggs, Jason Baldwin, Christopher D. Shank, Madison Redwine, Charles Kinnaird, Marlena Barginere

Other attendants: Stephanie Reilly (Autopsy Program), Silvio Litovsky (Pathology), Cynthia Ransburg-Brown (HSF legal counsel), two medical students representing a group of 13

A consult was requested by Drs. Mariko Nakano and Caroline Harada from Dept. of Medical Education regarding student concerns about the use of anatomic path specimens, obtained from incarcerated individuals through autopsy, in their medical education. It was explained by Nakano that, as this topic pertains not only to medical education but also to the UAB hospital policy on the process of consent for retention and use of obtained tissue samples, the Department of Medical Education would like to seek guidance about the legal and the ethical status of this tissue procurement process and the teaching use of these specimens.

Copies of the student letter and Dr. Stephanie Reilly's response letter (both attached to this summary) were shared and

discussed by the committee members present. Student representatives gave a brief overview, and Drs. Reilly and Litovsky discussed their responses, providing detailed information and clarifications.

Some key clarifications given by Drs. Reilly and Litovsky included:

1) Autopsy is, whether on prisoners or on non-prisoners, done not for the purpose of obtaining tissues or to profit from its service fee, but to identify the precise cause of death. Autopsy will benefit the deceased individuals' families, wards, and prisoners alike by clearing up the suspicions about the cause of death.  As such, autopsy is done out of respect for the deceased and the families, not out of lack thereof.
2) Autopsy on individuals who died in prison is, natural death or not, mandated by state laws. By state laws, wardens are to authorize the autopsy.
3) Organs removed from a cadaver's body during autopsy are then used for the secondary purposes of teaching future physicians and thereby benefits future patients. If such uses are disallowed, these specimens would only be disposed of, serving no useful purpose.
4) It is true that in private autopsy the next of kin (usually family members) has the option to opt out of the retention and teaching uses of a deceased person's organs following autopsy. However, it is extremely rare for them to do so. Of

over 3,000 cases of gross autopsy performed at UAB from 2011 to present, only 4 families refused to allow the teaching uses of the deceased person's specimens (for cultural or religious reasons).

5) Following autopsy on incarcerated individuals, the remaining body will usually be returned to family members (if available). Thus they should know the fact that autopsy was conducted.

6) In teaching, simply the best path specimens are selected and presented to medical students.
Of the 62 specimens used this year, only 4 were from prisoners. Specimens presented to MS1 students change from year to year.

The following points were also addressed by parties present at the meeting:

7) Even in cases of non-prisoner autopsy, the UAB's consent form takes an "opt-out" style. Unless the next of kin (usually family members) explicitly refuses to allow removed organs to be used for teaching purposes, they are presumed to have given consent for such uses. As indicated in 4), such refusal seldom occurs.

8) Secondary uses of once-discarded organs are considered legitimate and require no consent, as established in *Moore v Regents*, University of California.

Based on the discussions over points 1)-8), the Committee members largely endorsed the following:

3

9) There is no evidence that deceased prisoners are treated unfairly as compared with non-prisoners in the autopsy procedure or in the secondary teaching uses of removed organs. Both types of deceased individuals are treated with almost the same amount of respect and care.
10) It is hard to see any lack of ethicality in the retention and teaching uses of once-removed organs.

Thus, it was a position of the ethics committee that the autopsy process and the teaching uses of specimens obtained through the autopsy on incarcerated individuals in the current fashion would be ethically permissible.

At the same time, it was suggested that the UASOM teaching faculty, especially Pathology teaching staff, should teach medical students the procurement process of pathological specimens, the purpose and importance of autopsy, and the value of learning from rare pathological specimens.  The teaching staff should also demonstrate respectful handling of all pathological specimens, those of prisoners and non-prisoners alike, themselves. Preclinical students should not be made to wonder, "Had they been informed that the path specimens would be handled this way, would the family members have felt comfortable with the teaching uses of their loved one's tissues?" Dr. Reilly pointed out that, after this ethical concern was raised by medical students early this year, the path residents received careful re-training to make sure that all specimens are handled with respect.

Finally, student representatives were commended for coming forward to address this ethical concern, which demonstrates their genuine interests in the issues of health disparities in our society. Their active involvement greatly helped us understand the legal and ethical status of the specimen-procurement process through the autopsy program.