FILED

2024 Feb-24  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **Audrey Marie Dotson**; **Audrey South**; **Robert Dotson**; and **Holly Allen**, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| **v.** | ) ) ) | CASE NO.: <u>2:23-cv-01657-MHH</u> **JURY TRIAL DEMANDED** |
| **Alabama Department of Corrections**; **John Q. Hamm**; **Greg Lovelace**; **Deborah Crook**; **Karen Williams**; **ADOC Southern Division Director [Name Unknown]**; **ADOC Supervisory Officer Defendants 1-10 [Names Unknown]**; **ADOC Correctional Officer Defendants 1-10 [Names Unknown]**; **CHS AL LLC d/b/a YesCare Corp.**; **Manuel Pouparinas**; **YesCare Medical Staff Defendants 1-10 [Names Unknown]**; **Alabama Department of Forensic Sciences Angelo Della Manna**; **Edward A. Reedy**; **ADFS Employee Defendants 1-10 [Names Unknown]**; **The Board of Trustees of the University of Alabama**; **University of Alabama System**; **University of Alabama Health Services Foundation, P.C.**; and **UAB Defendants 1-20 [Names Unknown]**, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |



*The deceased, Brandon Clay Dotson*

"Death is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed, and thought, and walked among us has passed away. Something has gone. The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory. Beyond it may reach hope. It must be laid away. And the law—that rule of action which touches all human things—must touch also this thing of death."

Louisville & N.R. Co. v. Wilson, 123 Ga. 62, 63, 51 S.E. 24 (1905).

## COMPLAINT

COMES NOW, Plaintiffs Audrey Dotson, Audrey South, Robert Dotson, and Holly Allen (collectively, the "Plaintiffs"), and respectfully file this Complaint and allege the following:

### INTRODUCTION

Plaintiffs are a grieving family searching for answers in the wake of Brandon Clay Dotson's untimely death in an Alabama prison.

Brandon was found unresponsive in C-1 dormitory at Ventress Correctional Facility ("Ventress") on or around November 16, 2023 – the same day he was considered for parole release. Although he was not sentenced to die by an Alabama court, Brandon's sentence to the custody of the Alabama Department of Corrections ("ADOC") for a period of incarceration was tantamount to a death sentence. Brandon was a forty-three-year-old father.

After his family was alerted to his death by Defendant Warden Karen Williams, Brandon's mother, daughter,  brother and sister spent approximately five (5) days attempting to claim his body from ADOC, after submitting the proper paperwork as soon as they were alerted to his untimely death, in hopes of holding his funeral before Thanksgiving Day.

Finally Brandon's body was released to his family nearly a week later

around noon on November 21, 2023, with no explanation as to why his body had been retained by the State for as long as it was, and where it was during those days. When the family did receive Brandon's body, it was apparent that it had not been properly stored and refrigerated. It was noticeably decomposed, so despite the family's initial wishes, they had no choice but to hold a closed-casket funeral service.

Plaintiffs suspected foul play, in part because of the ADOC's extensive and ongoing violations of basic human and constitutional rights, so they retained autopsy pathologist Dr. Boris Datnow to conduct a second autopsy of Brandon's body. Upon conducting the autopsy, Dr. Datnow discovered that the heart was missing from the bag of viscera that had been placed in the cavity of Mr Dotson's abdomen. Though it is standard practice for organs to be removed for examination during an autopsy, standard procedure and state law orders that all organs be returned to the body, unless certain requirements are met. **Defendant(s) or their agents had – without the required permission from Brandon's next of kin – removed and retained or otherwise converted Brandon's heart.**

The loss of a loved one is one of the most intimate and personal experiences in our lives. We cope with death with rituals that allow us to say our final farewells to loved ones with honor and respect. Usually, the most powerful aspects of these

rituals involve what we do with the decedent's remains. Respect for the dead and sympathy for a family mourning a loss are some of the few things that unite us all. Also uniting us is the overwhelming sense of outrage we feel when we learn of unimaginable neglect in the handling of remains, sometimes involving deliberate fraud and the worst forms of human greed. Defendant's overall mistreatment of Brandon's body and the Dotson family amounts to outrageous conduct that needlessly and recklessly intensified the family's emotional distress.

First, Plaintiffs seek the immediate return of Brandon's heart (and any other remains retained by Defendants) to the family so that it may be examined by a pathologist and then properly cremated or interred.

Plaintiffs also seek the relief described herein to hold Defendants' accountable for wrongful death, violation of constitutional rights, fraud, negligence, wantonness, conversion, trespass to chattel, interference with the right of burial or disposition of the deceased, willful interference with remains, intentional and negligent mishandling of a corpse, intentional and negligent infliction of emotional distress, outrage and unjust enrichment.

This is a civil action against the ADOC, the ADOC Commissioner, ADOC supervisory personnel and corrections officers, and ADOC's medical provider CHS AL LLC d/b/a YesCare Corp. ("YesCare"), who established and/or maintained the

administrative machinery that permitted, encouraged, allowed, and/or were otherwise indifferent to the conditions that lead to, resulted in, and caused the death of Brandon on or around November 16, 2023, in violation of Brandon's constitutional rights.

This is also a civil action against all Defendants for engaging in the illegal, reprehensible and outrageous conduct of retaining organs and tissues from incarcerated individuals who die in state custody without the consent of their family, next of kin, or agents, as required by law.  Individuals across the ADOC; the Alabama Department of Forensic Sciences ("ADFS"); and The Board of Trustees of the University of Alabama (the "Board"), The University of Alabama System ("UA System"), University Of Alabama Health Services Foundation, P.C. ("UA Foundation"), (together, the "UAB Defendants") and their agents, knew or should have known of this repugnant practice. These trusted state agencies, state employees, and private medical professionals must be held accountable for disrespecting, misleading, and exploiting a grieving family at their most vulnerable moment.

## JURISDICTION AND VENUE

1.      This action arises under the Eighth and Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983. The Court has jurisdiction of this

matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2.      This judicial district is an appropriate venue under 28 U.S.C. §

1391(b)(1) because some of the Defendants are residents of and/or situated in

Jefferson County, Alabama, which is located in the Southern Division of the

Northern District of Alabama.

3.      The Court has supplemental jurisdiction over the pendent state law

claim pursuant to 28 U.S.C. § 1367(a).

## PARTIES

### *Plaintiffs*

4.      **Audrey Marie Dotson** is a citizen and resident of the state of

Alabama. She is the daughter of the deceased Brandon Clay Dotson.

5.      **Audrey South** is of legal age and a citizen and resident of the state of

Alabama. As next of kin, she is the representative of the estate of Brandon Dotson.

She is the mother of the deceased Brandon Dotson.

6.      **Robert Dotson** is a citizen and resident of the state of Alabama. He is

the brother of the deceased Brandon Dotson.

7.      **Holly Allen** is a citizen and resident of the state of Alabama. She is

the sister of the deceased Brandon Dotson.

8.      All Plaintiffs sue in their individual capacity, to hold Defendants

accountable for their wrongdoing, for the extensive intentional emotional damage they have inflicted, and for their blatant disregard for the law. Plaintiffs additionally seek to deter similar wrongful conduct from occurring in the future, so that no other family has to go through what the Dotson family has been through at the hands of Defendants.

9.     Plaintiff Audrey South seeks damages as the representative of Brandon's estate, to remedy the violations of Brandon's rights secured by the United States Constitution and the laws of the state of Alabama.

10.     The decedent, Brandon Clay Dotson, was originally from Lawrence County, Alabama, and is survived by his daughter Audrey Dotson; his mother Audrey South, his brother Robert Dotson and his sister Holly Allen. Brandon was forty-three years old at the time of his death.

*Defendants*

11.     **Alabama Department of Corrections** ("ADOC") is an administrative department of the state of Alabama, established by law, and is responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout this state, including Ventress Correctional Facility in Clayton, Alabama ("Ventress"). ADOC is based in Montgomery County, Alabama.

12.   **John Q. Hamm** was the Commissioner at ADOC at all relevant times. Defendant Hamm is responsible for exercising the authority, functions, and duties of the Commissioner of the ADOC including the appointment of personnel and employees within the ADOC required for the performance of the ADOC's duties towards the people it incarcerates. Those duties include operating a prison system that upholds the constitutional and human rights of persons within the custody of the ADOC, including the rights belonging to Brandon while he was a prisoner at Ventress.

13.   **Greg Lovelace** was the Chief Deputy Commissioner of Corrections at ADOC at all relevant times.

14.   **Deborah Crook** was the Deputy Commissioner of Health Services at ADOC at all relevant times.

15.   **Unnamed Southern Division Director Defendant**, whose identity shall be ascertained through discovery, was the Southern Division Director at ADOC who oversaw Ventress at all relevant times.

16.   **Karen Williams** was the warden at Ventress at all relevant times.

17.   **ADOC Supervisory Officers 1 through 10** had supervisory duties at Ventress at all relevant times.

18.   **ADOC Correctional Officers 1 through 10** were on duty at Ventress

at all relevant times.

19.    Defendants listed in paragraphs 11 through 18 shall collectively be the "ADOC Defendants".

20.    **CHS AL, LLC d/b/a YesCare Corp.** ("YesCare") is the third party medical provider at Ventress at all relevant times.

21.    **Manuel Pouparinas** is a medical doctor employed or contracted by YesCare, and was tasked with overseeing and providing medical care and life-saving treatment at Ventress at all relevant times.

22.    **YesCare Medical Staff 1-10** were tasked with providing medical care and life-saving treatment at Ventress at all relevant times.

23.    Defendants listed in paragraphs 20 through 22 shall collectively be the "YesCare Defendants".

24.    **Alabama Department of Forensic Sciences** ("ADFS") is an administrative department of the state of Alabama, established by law, and is responsible for conducting some of the autopsies of a person who dies in ADOC custody. ADFS's mission is "the application of science and medicine to the purposes of Justice." ADFS is based in Lee County, Alabama.

25.    **Angelo Dello Manna** was the Director of ADFS at all relevant times.

26.    **Edward A. Reedy** was a pathologist at ADFS at all relevant times.

27.   **ADFS Employee Defendants 1-10** were employees of ADFS at all relevant times.

28.   Defendants listed in paragraphs 24 through 27 shall collectively be the "ADFS Defendants".

29.   **The Board of Trustees of the University of Alabama** ("The Board"), established by the Alabama Constitution, ensures the effective leadership, management, and control over the activities of the three (3) doctoral research universities in The University of Alabama System. The primary functions of the Board are to determine the major policies of the System. These include reviewing existing policies; defining the mission, role, and scope of each campus; and assuming ultimate responsibility to the public and political bodies of Alabama. Rules, policies, and procedures are promulgated to ensure that, through The University of Alabama System Office, the necessary flow of information for such accountability takes place. The Board is based in Tuscaloosa County, Alabama.

30.   **University of Alabama System** ("UA System") is a public university system in Alabama that coordinates and oversees three (3) research universities, including University of Alabama at Birmingham ("UAB"). Rules, policies, and procedures are promulgated by the System to ensure that the necessary flow of information for accountability takes place concerning the research universities'

policies; mission, role, and scope of each campus; and the ultimate responsibility to the public and political bodies of Alabama. UA System is based in Tuscaloosa County, Alabama.

31.    **University of Alabama Health Services Foundation, P.C.** ("UA Foundation") is a 501(c)(3) public charity based in Jefferson County, Alabama. UA Foundation is based in Jefferson County, Alabama.

32.    **Unnamed UAB Defendants 1-20** were employed by the Board, the System, or UA Foundation and knew or should have known that these entities were receiving organs and tissues from individuals who had died in prison custody without the consent of the deceased, their agents, or their next of kin.

33.    Defendants listed in paragraphs 29 through 32 shall collectively be the "UAB Defendants".

34.    Defendants were acting under color of State law at the time of the events described in this Complaint.

35.    Individual Defendants are sued in their official and personal capacities.

36.    At this time, the true and correct names of Unnamed Defendants are unknown to the Plaintiffs, but will be added by amendment when ascertained.

## STATEMENT OF FACTS

*Before Brandon Dotson's Death*

37.     Plaintiffs were informed and believe that in the days leading up to Brandon's death, Brandon had been in segregated housing asking for help, as he was the target of violence by other incarcerated individuals. Defendants ADOC Supervisory Officers and Correctional Officers ignored Brandon's unmistakable pleas for help and instead returned him to a "general population" dormitory, where he could access drugs and easily be attacked by those seeking to harm and exploit him.

38.      Upon information and belief, Brandon had repeatedly been forced to vacate his assigned bed by incarcerated men who extorted and abused him.

39.     ADOC Supervisory and ADOC Correctional Officers were aware of Brandon's concerns for his safety, yet did nothing to prevent the harm that came to him in the weeks leading up to his death on November 16, 2023.

40.     At the time of Brandon's death, the dormitory in which he was housed was grossly understaffed and severely overcrowded. ADOC Defendants, including but not limited to Defendant Warden Williams, Defendant Southern Regional Director, Defendant Lovelace and Defendant Hamm all had notice of Ventress's chronic understaffing of correctional officers and overcrowding of incarcerated people, and the volatile and violent conditions that such dynamics create.

41.     No member in the correctional staff was available to prevent the abuse
Brandon endured, and the constant and unlimited access to drugs that he had, or to
rescue Brandon timely to save his life, or if such staff was available, they ignored
the warning signs and direct pleas for help when they had every opportunity to
intervene and prevent the death of Brandon.

42.     ADOC Supervisory Officers and ADOC Correctional Officers were
deliberately indifferent in responding to the known security and safety hazards and
Eighth Amendment violations at Ventress, even as the level of drug use and
violence has escalated.

43.     ADOC Defendants' actions and inactions proximately caused
Brandon's death, in violation of his Eighth Amendment rights not to suffer cruel
and undue punishment while incarcerated.

44.     The Plaintiffs seek punitive damages from the ADOC Defendants for
Brandon's death due to their deliberate indifference to his health and safety, and
failure to protect him from harm while incarcerated.

*Brandon Dotson's Death*

45.     Upon information and belief, Brandon was found unresponsive in his
assigned bed in C-1 dormitory at Ventress on November 16, 2023. The exact time
of his death is unknown, as such documentation has not yet been provided to

Plaintiffs.

46.    One ADOC correctional officer (whose name is not yet confirmed by Plaintiffs) was not supervising the dormitory unit C-1 where Brandon was found unresponsive, despite being assigned to oversee this unit. This ADOC officer was socializing in another area of the prison, rather than doing their job. Had this employee seen Brandon's serious medical needs sooner, Brandon's death likely could have been prevented through life-saving interventions.

47.    Upon information and belief, ADOC prisoners conduct many of the staffing functions of Ventress because the ADOC does not have adequate staffing levels to perform the duties necessary to ensure constitutional conditions for those incarcerated. One function prisoners performed the day Brandon died was conducting "count" to identify whether each prisoner in the facility is alive and accounted for. Had ADOC Supervisory Officers or ADOC Correctional Officers conducted the count on the day of Brandon's death rather than prisoners, Brandon would have been found unresponsive sooner than he was, and it is likely his life could have been saved.

48.    In contravention to ADOC Defendants' stated policies, incarcerated men loaded Brandon onto a trash cart to wheel him to the Ventress infirmary.

49.    Upon information and belief, no emergency intervention was

performed or called in to attempt to revive Brandon. No ambulance or emergency transport service was called by ADOC and YesCare Defendants.

50.    Upon information and belief, ADOC and YesCare Defendants failed to administer Naloxone or its equivalent, which can reverse an opioid overdose.

51.    ADOC Defendants and YesCare Defendants delayed, denied, and/or were deliberately indifferent to Brandon's serious medical needs, and failed to immediately provide or otherwise obtain immediate emergency medical treatment, and as a result, Brandon died.

*ADOC Conditions of Confinement*

52.    The 2023 calendar year was the deadliest in the Alabama Department of Corrections' history, with at least 325 in-custody deaths. As a point of comparison, from February 2015 through November 2015, only seven (7) people were killed in the ADOC, which at the time was considered quite high.

53.    The ADOC lists "[t]o ensure safe, humane and constitutional conditions of incarceration in all facilities," including Ventress, as one of its Department priorities.

54.    In its 2023 Annual Report, the Alabama Department of Corrections also states as its Department Values: "We value a safe, secure and rehabilitative environment for the inmate population."

55.     Despite these professed values in its own policy statements and acknowledgement of violent consequences due to overcrowding and understaffing, violence has continued unabated throughout ADOC prisons for years. Defendant Hamm has repeatedly acknowledged that the ADOC faces violent consequences from prison overcrowding and understaffing.

56.     On October 6, 2016, the United States Department of Justice ("DOJ") announced that it had opened a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation into Alabama's male prisons, including Ventress.

57.     In June of 2017, the United States District Court found that "ADOC facilities are significantly and chronically overcrowded." Braggs v. Dunn, 257 F. Supp. 3d 1171, 1193 (M.D. Ala. 2017). The court further noted that "The combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." Id at 1200.

58.     Former ADOC Commissioner Jefferson Dunn, in sworn testimony in the United States District Court for the Middle District Of Alabama, "aptly described the prison system as wrestling with a 'twoheaded monster': overcrowding and understaffing." Braggs, 257 F. Supp. 3d at 1184.

59.     On April 2, 2019 the DOJ Civil Rights Division released the results of their investigation into ADOC, finding "reasonable cause to believe that Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions. The violations are exacerbated by serious deficiencies in staffing and supervision and overcrowding."

60.     The DOJ issued a second report detailing findings of excessive force by officers on July 23, 2020.

61.     On December 9, 2020, the DOJ filed a lawsuit against ADOC. The complaint alleges that the conditions at Alabama's prisons for men violate the Constitution because Alabama fails to provide adequate protection from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, fails to provide safe and sanitary conditions, and subjects prisoners to excessive force at the hands of prison staff. The lawsuit is the result of a multi-year investigation into allegations of constitutional violations within Alabama's prisons for men conducted by the DOJ's Civil Rights Division and the U.S. Attorney's Offices for the Northern, Middle, and Southern Districts of Alabama.

62.     As required by CRIPA, the DOJ provided the state with written notice

of the supporting facts for these alleged unconstitutional conditions, and the
minimum remedial measures necessary to address them in Notice Reports issued
on April 2, 2019 and July 23, 2020. CRIPA authorizes the department to act when
it has reasonable cause to believe there is a pattern or practice of deprivation of
constitutional rights of individuals confined to correctional facilities operated by or
on behalf of state or local government. For over 20 months the DOJ engaged in
negotiations with ADOC without achieving a settlement that would correct the
deficiencies identified by the DOJ's investigation.

*Unconstitutional Conditions at Ventress*

63.    According to Defendant ADOC's website, "Ventress has a primary
mission of providing alcohol and drug treatment to ADOC's inmate population."

64.    Despite this claim, Ventress is essentially an open-air drug market.
Prisoners report having much easier access to drugs in ADOC than they do in the
free world. Upon information and belief, officers and other employees and
contractors of ADOC are often smuggling this contraband into the prisons.

65.    ADOC Defendants knowingly and intentionally fail to prevent the
illegal contraband trade that floods Ventress with dangerous drugs.

66.    In addition to the contraband, prisoners at Ventress are often
double-bunked. Supervisors and officers' lines of sight inside the dormitories are

limited, and this combination can lead to a higher risk of drug use and violent activity.

67.     In addition to the overcrowding and understaffing, the violence and drug use at Ventress perpetuates year after year because its correctional officers continue to lack training and supervision needed to turn the tide of unrelenting violence inside prison walls.

68.     At all times material to this action, the ADOC Defendants knew of the prevalence of contraband weapons and drugs, uncontrolled movement of inmates, the understaffing, and overcrowding at Ventress, and knew that they needed to take steps to prevent the flow of contraband, control movement, reduce overcrowding or ensure adequate staffing in order to prevent further murders and assaults, but failed to do so.

69.     Defendant Hamm had been briefed about overcrowding, correctional understaffing, and ongoing violence and threats of violence and drug overdoses at Ventress in the months and years leading up to Brandon's death. Despite his knowledge of substantial risks of serious harm to prisoners at Ventress, Defendant Hamm failed to act to prevent prisoners at Ventress, including Brandon, from suffering injury and death.

70.     Defendants Lovelace, Williams, Supervisory Officers and

Correctional Officers had been briefed about overcrowding, correctional understaffing, and ongoing violence and drug access at Ventress Correctional Facility in the months leading up to Brandon's death. Despite their knowledge of substantial risks of serious harm to prisoners at Ventress, Defendants failed to act to prevent prisoners at Ventress, including Brandon, from suffering injury and death.

*After Brandon's Death*

71.     Ventress's Warden Defendant Williams called Brandon's brother Robert Dotson the evening of his death, November 16, 2023, as Brandon had listed Robert as his next of kin upon being committed to the ADOC. Robert received this call at approximately 5:40 PM.

72.     Defendant Warden Williams told Robert that his brother was deceased, and then told him that "they" were "working on him in the back." When Robert questioned why they were working on Brandon if he was dead, Williams responded that Brandon had overdosed and they did not expect him to make it. Williams did not clarify whether Brandon was still alive at this time.

73.     Brandon's death certificate, certified by Defendant Dr. Manuel Pouparinas, lists his time of death at 1740.

74.     According to Warden Williams and ADFS pathologist Dr. Edward

Reedy, Brandon's body was picked up by J. K. Hopper with Capital Removal

Services. It is unknown what time Brandon's body was picked up from Ventress.

75.     Defendant Williams informed Robert that his brother was found dead

in his bed. Robert asked Defendant Williams whether Brandon had been beaten to

death. Defendant Williams responded abruptly, asking why everyone thinks that a

prison death is always caused by a beating.

76.     Defendant Williams asked Robert if his family intended to claim the

body. Robert responded affirmatively, that they would claim the body. Defendant

Williams expressed surprise, commenting that many families did not have the

financial resources to claim the body and that, as a result, sometimes the wardens

did not contact the families at all when a death occurred.

77.     Robert informed Defendant Williams that their mother, Audrey South,

would be making decisions regarding the collection of Brandon's remains.

Williams told Robert that she would call Ms. South in the morning, but when Ms.

South got word of Williams' intention to delay the conversation, she immediately

called Williams herself to get more information regarding her son's death.

78.     Williams told Ms. South that she would need to submit paperwork to

ADOC to allow the family to claim Brandon's body. Williams told Ms. South that

ADOC was required to perform an autopsy, when Ms. South expressed her desire

for ADOC not to touch Brandon's body at all. Williams did not provide to or seek from Ms. South any other information.

79.     Ms. South provided All of the necessary paperwork to ADOC to claim Brandon's body on November 17th, 2023.

80.      Plaintiffs and their attorney repeatedly attempted to reach Williams and other ADOC employees to claim Brandon's body on Friday, November 17th; Saturday, November 18th; Sunday, November 19th; and Monday, November 20th.

81.     On Tuesday, November 21st, Plaintiffs finally gained possession of Brandon's body at approximately 11:30 AM.

*Condition of Brandon's Body*

82.     Upon receiving Brandon's body from ADFS Defendants, Plaintiffs immediately had it brought to Dr. Boris Datnow, a board certified pathologist they had hired to conduct a second autopsy.

83.     Plaintiffs were informed by Dr. Datnow that Brandon's heart had been removed from his body, and was not present in his body along with his other viscera.

84.     Dr. Datnow noted that the body was in a noticeable state of decomposition, and based on his professional opinion, determined that the body could not have been properly refrigerated during the five (5) days that it was in the

possession of ADFS.

85.    The funeral director at Lawrence Funeral Home further informed Plaintiffs that the body was highly decomposed when it arrived. Based on his years of experience accepting corpses, the funeral director determined that the decomposition indicated that the body had not been properly stored while in the possession of ADFS.

86.    The ADOC and ADFS or one of their agents was or should have been in sole possession of the body of Brandon Dotson after his death until it was claimed by Plaintiffs.

87.    At some point while Brandon's body was in the sole control of Defendants or their agents, his heart was removed from his body and retained by Defendants or their agents.

88.    Upon opening the casket, the family members saw bruising on the back of Brandon's neck and excessive swelling across his head. The stench of his body was overwhelming. As a result, the family decided to have a closed casket funeral.

*Chain of Custody of Brandon's Body*

89.    As a result of Defendants' refusal to provide Plaintiffs with information concerning the chain of custody for Brandon's body, Plaintiffs are not

aware of which entities had possession of Brandon's body and for how long.

90.     Based on information and belief, Brandon was found unresponsive in his bed in the afternoon on November 16, 2023.

91.     Based on information and belief, Brandon was wheeled to the Ventress infirmary on a trash cart by other inmates.

92.     Based on information and belief, Brandon was placed in a room in the infirmary that is used when a person is at risk of death or deceased. This room is closely monitored, and only authorized personnel can enter.

93.     Based on information and belief, J.K. Hopper from Capital Removal Services ("Capital Removal") came to Ventress to transport Brandon's body. Hopper arrived and Brandon's body was loaded into his transport van while it was dusk outside, so at or around sunset at 4:44 PM.

94.     It was reported to ADFS at 7:28 PM that Brandon had been found unresponsive in a top bunk at Ventress.

95.     ADFS received Brandon's body at 2:19 AM on November 17, 2023.

96.     No Defendant has accounted for the location of Brandon's body between when it was picked up by Capital Removal from Ventress at dusk and when it was dropped off at ADFS over nine (9) hours later.

97.     ADFS pathologist Dr. Reedy Testifies that the heart was present in the

body when the anterior torso was opened, that he removed the heart from the body to weigh it and examine it, and that he sectioned it extensively. he reports that a small representative section of the heart muscle was saved in formalin, per standard autopsy practice," and that "[t]he remainder of the extensively sectioned heart tissue, along with all other internal viscera, was placed in a viscera bag, which was then positioned inside the body cavity, to be released with the body, and the body was closed."

98.    Neither ADFS nor any other Defendant has provided Plaintiffs with evidence that the body was not further tampered with after Dr. Reedy completed the autopsy but it was claimed by the family.

99.    ADFS claims that Brandon's body was placed into refrigerated storage from the time it was received on November 17 until his autopsy was performed on Monday, November 20 at 8:53 AM, and then returned to refrigerated storage after the autopsy was complete at 9:59 AM until the body was claimed the next day by Plaintiffs' chosen funeral home. However, Dr Datnow and the Lawrence Funeral Home Director indicate that it cannot be possible that the body was properly refrigerated and that it was in such an advanced state of decomposition when the family received the body on Tuesday, November 21st, in the absence of some other form of illegal activity.

100.   To date, no one has explained to the family why Brandon's heart was missing when his body was turned over to them. Plaintiffs do not know where Mr Dotson's heart currently is, or in whose possession.

*UAB Heart Transplant on November 16, 2023*

101.   Based on information and belief, medical personnel employed or contracted by UAB Defendants carried out a heart transplant on the evening of November 16th, 2023, at the exact time that Brandon's body is unaccounted for.

102.   In the afternoon of November 16th, 2023, a person (whose name is known to Plaintiffs' counsel but is being withheld to respect their privacy) who had been awaiting a heart transplant received word that a compatible heart had become available, and that the heart transplant would be performed that evening.

103.   The heart transplant surgery was delayed from its originally scheduled time of approximately 10:00 PM until 12:30 AM, as the heart had not yet arrived at the location where the transplant was to be performed.

104.   At or around 12:30 AM on November 17th, the heart transplant surgery conducted by agents, contractors or employees of UAB Defendants began.

105.   After an approximately 11-hour surgery, the heart transplant was successfully completed on November 17, 2023.

106.   UAB conducts approximately 30 heart transplants per year.

107.   Alabama's number of organ donors upon death outpaces the nation. For example, in 2016, the Alabama Organ Center, now Legacy of Hope, had 153 organ donors donate 425 organs upon death – a 24% increase from 2015. During that same period, nationwide transplant numbers increased only 8.5%. During that same period, the number of autopsies performed by UAB of individuals who died while in custody of ADOC increased.

*UAB History of Using Specimens from Incarcerated People*

108.   In 2018, a group of medical students at University of Alabama at Birmingham School of Medicine ("UABSOM") noticed that a disproportionate number of the specimens they encountered during their medical training originated from individuals who had died in prison custody within the Alabama Department of Corrections. These students ("UABSOM Students") began conducting their own research into this anomaly.

109.   The UABSOM Students gathered the following facts:

a.   The UAB Division of Autopsy is contracted by the Department of Corrections to perform autopsies on incarcerated individuals who die in state custody. Each autopsy request is initiated by a warden. As documented through UAB Division of Autopsy publications, from 2006 to 2015, per the Division of Autopsy' 2017 publication, 23% of

their yearly income comes from Department of Corrections autopsies,

and 29% comes from Alabama Dept of Forensic Science.

*Am J Forensic Med Pathol* • Volume 38, Number 3, September 2017



**FIGURE 2.** Proportion of income generated from each contract (2006–2015).

b.  Wardens can limit the autopsy to a strict determination of death, with

no tissues retained for research or education. However, according to a

UABSOM doctor, wardens always sign "no limitations" on the form

which initiates the request for autopsy. Neither the patient, nor their

family, has consented to the retention of tissues for teaching,

education, or research.

c.  A percentage of teaching samples used in UABSOM's preclinical

pathology education have been obtained without consent.

d.  Between 15% and 69%  of incarcerated persons have a persistent

medical problem not examined by medical personnel. Between 21%

and 36% are not receiving prescriptions for current medical needs.

e.  The incarcerated population have  inconsistent healthcare access

constrained by, among other factors: $12-$100 copays, while making

No money for their labor or mere cents per hour.

f.  The Mission Statement of UABSOM is "[t]o improve the health and

well-being of society, particularly the citizens of Alabama, by

providing innovative health services of exceptional value that are

patient- and family-centered, a superior environment for the education

of health professionals, and support for research that advances

medical science."

g.  Because of the involuntary nature of their confinement, prisoners are

more vulnerable to coercion regarding their consent to participate in

research, thus it is important to make the process as voluntary as

possible.

h.  A disproportionate amount of pathology lab specimens used for

teaching purposes are from incarcerated individuals because they have the most advanced pathology (i.e. it is easier to study a 3 cm tumor than a 3 mm tumor). Additionally, there have already been abstracts written by UAB Pathology regarding misdiagnosis rates at UAB Hospital versus the ADOC, including organs from incarcerated individuals.

i. The pathology lab has a private contract to perform autopsies for the DOC, then uses these specimens for both research and teaching, but is in no way advocating for a change in health care access or quality received from the DOC.

110. On September 20th, 2018, the UABSOM Students met with the UABSOM Ethics Oversight Committee ("Ethics Committee") to present their findings. During this meeting, the majority of the Ethics Committee members took the position that organs removed from a cadaver's body during autopsy are used for the secondary purposes of teaching future physicians and thereby benefits future patients. If such uses are disallowed, these specimens would only be disposed of, serving no useful purpose. Thus, it was a position of the ethics committee that the autopsy process and the teaching uses of specimens obtained through the autopsy on incarcerated individuals in the current fashion would be

ethically permissible.

111.    The Ethics Committee acknowledged that it is true that in private autopsy the next of kin (usually family members) has the option to opt out of the retention and teaching uses of a deceased person's organs following autopsy.

112.    The UABSOM Students documented that they felt frustration at the lack of response from the Ethics Committee. They pursued meetings with other administrators and asked administrators to implement the following policies:

    a.  Any organs obtained with consent given only by a warden/entity of the state shall be removed from the education collection.

    b.  Until a process is created to obtain informed consent from incarcerated people or their true next of kin, their organs will not be used for educational or research purposes.

    c.  Language should be included to minimize potential coercion of organ donation by prisoners and offer the right to withdraw without penalty. Examples from the University of Virginia Institutional Review Board recommendations:

        i.  "Your information will not be shared with the parole board or the prison staff. Your participation will be kept private and will not affect your parole review" and "If you decide to withdraw

from the study, this information will not be shared with the

parole board or with prison staff"

113.   On November 26, 2018, the UABSOM Students brought their

unaddressed concerns to the administration in a formal meeting. They alerted the

administration that the Ethics Committee meeting was unproductive. The

UABSOM Students commented that no Ethics Committee member presented

outside research,  prompting concern that the Ethics Committee did not do their

due diligence regarding the issue. In addition, students noted that data from the

Autopsy Department was provided by members of the Autopsy Department and

was not double checked by the Ethics Committee. Furthermore, students reported

that they were accused of being "inflammatory" and comparing their educators to

"criminals."

114.   During this November 26th meeting, the UABSOM Students also

alerted the administration to the fact that the autopsy lab responded to the student

concerns by stating that they are no longer including incarceration status in patient

vignettes because of the students ethical concerns, as had been done before they

raised their ethical concerns. The students commented that refusing to provide

information about the source of the tissues they encountered in the autopsy lab

rendered them unable to make an informed decision about their participation in

such practices.

115.    An administrator admitted that 1/3 of the samples in the pulmonary lab are from incarcerated individuals. Based on this admission and other information, the UABSOM Students concluded that incarcerated people are 50 times more likely to represent teaching samples than non-incarcerated individuals.

116.    On February 18th, 2019, the UABSOM Students again met with administrators. An administrator stated that solid organ autopsy specimens from incarcerated persons would no longer be utilized in UABSOM *undergraduate* medical education. This administrator informed the students that specimens would remain in the Pathology Department but would not be used to teach students. Another administrator stated that the Pathology Department has been asked to obtain consent for future specimens. Students documented, however, that no measures were taken or, to their knowledge, have been taken to enforce this action in any way.

117.    Upon information and belief, UAB Defendants (including but not limited to their medical employees, agents or contractors) had, at some point after Brandon's death, access to and possession of his heart.

## ATTORNEYS' FEES

118.    In order to prosecute the causes of action alleged herein, the Plaintiff

retained the undersigned attorneys to litigate the claims in this case. The Plaintiff is entitled to recover reasonable attorneys' fees and costs. See 42 U.S.C. § 1988.

## COUNT I

### Eighth and Fourteenth Amendment Violations; 42 U.S.C. § 1983

### *(Against ADOC Defendants, YesCare Defendants)*

119.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the paragraphs 37 through 70 of this Complaint as if fully set forth herein.

120.   Defendants acting under color of law within the meaning of 42 U.S.C. § 1983 were deliberately indifferent to the potential harm to Brandon, failed to intervene, protect, and keep Brandon safe from harm, which ultimately resulted in Brandon's death.

121.   The Eighth Amendment imposes a duty upon prison officials to protect prisoners from violence at the hands of other prisoners and access to illicit drugs.

122.   Defendants breached these duties and were deliberately indifferent to Brandon's safety, well being, and health, and thereby failed to prevent harm that was imminent and reasonably foreseeable.

123.   As a consequence, Brandon was incarcerated under conditions posing

a substantial risk of violations to his Eighth Amendment right against cruel and unusual punishment, which ultimately caused his death.

124.   Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Brandon and constitute clearly-established violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

125.   As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Brandon experienced grave physical, emotional, and psychological injury and pain; and died.

126.   The Defendants' above-described actions were deliberate and in reckless disregard of the constitutional rights of Brandon.

127.   Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial. Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants.

## COUNT II

**Deliberate Indifference to Serious Medical Needs**

**42 U.S.C. § 1983**

***(Against ADOC Defendants and YesCare Defendants)***

128.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 37 through 70 of this Complaint as if fully set forth herein.

129.   On or about November 16, 2023, Defendants and their agents acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Brandon's serious medical needs, in that they had knowledge of Brandon's serious medical need and condition requiring emergency medical treatment yet refused to obtain or authorize that treatment for Brandon by delaying or denying said treatment.

130.   The decisions of these individual defendants to deny Brandon medical care were pursuant to one or more policies or customs at ADOC generally and Ventress specifically, which included inadequate correctional officer training, allowing untrained and/or poorly trained corrections officers to make decisions regarding medical treatment, and denying and delaying necessary medical care to inmates with serious medical needs in order to avoid incurring charges for said medical treatment, overcrowded prison, and understaffed correction officer and medical staffs.

131.   As a result of Defendants' deliberate indifference to Brandon's serious medical needs for emergency treatment Brandon experienced severe pain,

suffering, and death thereby depriving Brandon of his clearly established rights as a prisoner under the Eighth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983.

132.   The delay and denial of emergency medical treatment to Brandon for the above-described serious medical need is directly attributable to one or more customs and/or policies of the Defendants and/or violations of one or more customs and policies.

## Count III

**Conspiracy to Cover Up Deliberate Indifference to Serious Medical Needs and Health and Safety**

**42 U.S.C. § 1983**

***(Against All Defendants)***

133.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 37 through 117 of this Complaint as if fully set forth herein.

134.   Defendants conspired with each other to cover up the deliberate indifference to health and safety, failure to protect from harm, deliberate indifference to serious medical needs, medical negligence, the conversion of Brandon's heart without the required approval from his next of kin, and the

mishandling of Brandon's corpse.

135.   As a result of Defendants' acts and omissions, Plaintiffs have suffered severe actual and emotional damages.

## COUNT IV

**Equal Protection**

**Fourteenth Amendment of the United States Constitution**

***(Against All Defendants)***

136.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 71 through 117 of this Complaint as if fully set forth herein.

137.   Defendants singled out Brandon and Plaintiffs to exploit and conspire against due to Brandon's status as an incarcerated citizen. Defendants recklessly or intentionally withheld life-saving treatment from Brandon, and then removed his heart for unauthorized purposes, because he was incarcerated.

138.   Prison practices that single out inmates for organ removal and retention merely because they happen to die in prison, or because of their imposed sentence, or because of their lack of access to financial resources to ensure adequate care, lack the requisite rationality required by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

## COUNT V

### Interference with the Right of Burial or Disposition of the Deceased

### 42 U.S.C. § 1983

### *(Against All Defendants)*

139.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint 71 through 117 as if fully set forth herein.

140.   Defendants interfered with the right of burial or disposition of the deceased in violation of the Due Process Clause of the Fourteenth Amendment.

141.   Following the deceased's death, Defendants interfered with Plaintiff's right to dispose of the deceased's remains in a timely manner by refusing to release the body to Plaintiff for burial, and turning over the body in a highly decomposed state with the heart missing.

142.   Defendants' interference with Plaintiff's right of burial or disposition of the deceased's remains constituted a violation of Plaintiffs' due process rights under the Fourteenth Amendment.

143.   Although the deceased passed away before this Complaint was filed, Plaintiff Audrey South has standing to assert this due process claim as the personal representative of the deceased's estate.  The claim thus survives the deceased's

death.

## COUNT VI

### State Law Wrongful Death

### Ala. Code § 6-5-410

### *(Against All Defendants)*

144.    The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 37 through 117 of this Complaint as if fully set forth herein.

145.    The death of Brandon was the direct and proximate result of Defendants' reckless and intentional acts and omissions.

146.    Defendants' actions and failures to act proximately caused Brandon's death. Defendants caused the wrongful death of Brandon as contemplated by Alabama Code § 6-5-410.

147.    Brandon could have commenced an action for these wrongful acts or failures to act if they had not caused his death. Defendants' misconduct gives rise to a cause of action by Brandon's personal representative and renders Defendants liable for punitive damages under Alabama's wrongful death statute, Ala. Code § 6-5-410.

148.    Said defendants, separately and severally, owed a duty to Brandon to

provide him with a standard of care of the degree of diligence and skill common in the community and applicable to prisoners such as Brandon.

149.   Defendants violated this duty of care, and violated their own policies and procedures, and in doing so violated statutory their duty under Alabama law to attend to the needs of Brandon Dotson in the custody of the ADOC.

## COUNT VII

### Negligence

### *(Against All Defendants)*

150.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 37 through 117 of this Complaint as if fully set forth herein.

151.   Defendants returned the deceased's body to Plaintiffs missing organs and in a highly decomposed state.

152.   Defendants owed a duty of care to properly handle the deceased's body. By returning the body missing organs and in an advanced state of decomposition, Defendants breached this duty and were negligent in their handling of the corpse.

153.   As a direct and proximate result of Defendants' negligent actions, Plaintiff suffered actual and emotional distress damages.

## COUNT VIII

**Wantonness**

**Ala. Code § 6-11-20**

*(Against All Defendants)*

154.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

155.   Defendants committed an act of wantonness when they willfully removed an organ from a deceased prison inmate without obtaining the necessary consent from the inmate's family.

156.   Defendants consciously disregarded the rights of Brandon's family by depriving them of a right that belonged to them alone.

157.   Defendants were fully aware that they needed consent from the inmate's family before harvesting the organ, yet they proceeded to do so anyway in blatant disregard for the family's rights. Their willful failure to obtain consent demonstrates a reckless indifference that rises to the level of wantonness under the law.

158.   Therefore, the state defendants' unauthorized organ removal constitutes wantonness for which they can be held liable.

## COUNT IX

### Failure to Notify Next of Kin When Retaining Organs

### SB 22 (2021)

### *(Against All Defendants)*

159.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

160.   Defendants violated state law by failing to provide notice to next of kin when they retained the organs of Brandon.

161.   Defendants violated state law by retaining a deceased person's entire organ for research or for any other purpose not in conjunction with a determination of identification or cause or manner of death without notification to, and approval by, the appropriate next of kin.

## COUNT X

### Unauthorized Conversion of Anatomical Parts

### Ala. Code § 22-19-163 (2022)

### *(Against All Defendants)*

162.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set

forth herein.

163.   Defendants violated state law by failing to provide notice to next of kin when they retained the organs of Brandon.

164.   Defendants' outrageous and inexcusable mishandling of the deceased's body amounts to a reprehensible violation of human dignity and common decency. Their depraved indifference in returning the body bereft of vital organs and in a revolting state of decay shows utter contempt for the deceased's memory and for the profound emotional distress wantonly inflicted upon the Plaintiff.

165.   No civilized society can tolerate such a barbaric desecration of the dead. That Defendants had the audacity to ransack the body and convert its parts for their own selfish gain only compounds the egregiousness of their conduct. Their brazen theft and exploitation of the helpless deceased shocks the conscience.

166.   In callously mistreating the deceased's mortal remains, Defendants trampled on Plaintiff's sacred rights of sepulcher. Their appalling misconduct is nothing short of grave robbery and mutilation.

167.   Defendants violated state law by retaining a deceased person's entire organ for research or for any other purpose not in conjunction with a determination of identification or cause or manner of death without notification to, and approval

by, the appropriate next of kin.

## COUNT XI

### Unjust Enrichment

### *(Against All Defendants)*

168.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 71 through 117 of this Complaint as if fully set forth herein.

169.   Defendants retained various body parts, tissues, and organs from the deceased after death without seeking or obtaining permission from Plaintiff to do so.

170.   Defendants kept the body parts for purposes of research, study, and potential sale or profit.

171.   By retaining the body parts without consent, Defendants were unjustly enriched to Plaintiff's detriment.

172.   Although certain Defendants may have had lawful initial custody of the body, they did not have the right to retain any parts of it indefinitely without authorization.

173.   Plaintiffs had the right to possession of the body in its entirety for burial or other lawful disposition. Defendants' continued retention and use of the

body parts for their own benefit deprived Plaintiffs of that right.

174.   Therefore, Defendants' unauthorized retention and use of the

deceased's body parts constitutes unjust enrichment.

## Count XII

### Spoliation of Evidence

#### *(Against All Defendants)*

175.   The Plaintiffs adopt and incorporate by reference each and every

allegation contained in the preceding paragraphs 71 through 117 of this Complaint

as if fully set forth herein.

176.   Defendants performed an autopsy on the deceased and removed the

heart, thereby concealing the true cause of death. By taking this action, Defendants

intentionally or recklessly destroyed or altered key evidence that deprived Plaintiff

of the ability to determine how the deceased died through an independent autopsy.

177.   The heart is a vital organ that would provide critical evidence in

assessing the cause of death. Without the heart, Plaintiff cannot obtain an accurate

and complete determination of the circumstances surrounding the deceased's death.

178.   Defendants had a duty to preserve the integrity of all body parts

during the autopsy for any subsequent examinations.

179.   Their removal and retention of the heart breached this duty and

prevented Plaintiff from exercising the right to conduct a full autopsy with all organs present.

180.   As a direct result of Defendants' spoliation, Plaintiff suffered damages from being unable to discover the true cause of death.

## Count XIII

### Intentional Infliction of Emotional Distress, or Outrage

#### *(Against All Defendants)*

181.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in the preceding paragraphs 71 though 117 of this Complaint as if fully set forth herein.

182.   Defendants' conduct in unlawfully converting and retaining the heart of the deceased and returning the body to Plaintiffs in a highly decomposed state was intentional or reckless; was extreme and outrageous; and caused emotional distress so severe that no reasonable person could be expected to endure it.

183.   Defendants' conduct was so extreme in degree as to go beyond all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized society.

184.   This wrongful conduct occurred in the context of a family-burial.

## COUNT XIV

**FOR INJUNCTIVE RELIEF AGAINST DEFENDANT HAMM AND**

**DEFENDANT ANGELO DELLA MANNA IN THEIR OFFICIAL**

**CAPACITY**

*(Against ADOC, Hamm, ADFS, Della Manna, The Board, UA System, and UA*

*Foundation)*

185.   The Plaintiffs adopt and incorporate by reference each and every

allegation contained in the preceding paragraphs 71 through 117 of this Complaint

as if fully set forth herein.

186.   The following Counts are brought for injunctive relief against

Defendant ADOC Commissioner Hamm and Defendant ADFS Director Della

Manna in their official capacity, pursuant to *Ex parte Young*, because they have the

requisite connection with ADOC's violations of the Dotson family's rights detailed

herein, namely the authority and responsibility to stop or prevent the violations

from occurring, by complying with the relief requested in Plaintiff's upcoming

motion for a temporary restraining order.

187.   Defendants could halt or contribute to halting the constitutional

violations pleaded herein. Commissioner Hamm has the authority to oversee the

handling of the remains of a deceased incarcerated individual who dies in ADOC

custody and return them to Plaintiffs, as well as to instruct wardens to follow the

law by requiring notification to and approval by the next of kin when organs are retained after there is a death in ADOC custody.  Defendant ADFS Director Della Manna has the authority to instruct ADFS medical examiners not to remove organs or tissues from a body undergoing an autopsy without permission from the next of kin. UAB Defendants have the authority to instruct all institutions under its supervision to cease the practice of retaining organs upon a death of a person in state custody without proper and lawful consent from next of kin.

## OTHER MATTERS

188.   All conditions precedent to the bringing of this suit have occurred.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs respectfully requests that this Court enter an Order:

1.  Entering a judgment against Defendants;

2.  Granting Plaintiffs' motion for a temporary restraining order to:

    a.  Prevent Defendants from retaining the remains of Plaintiffs' loved one Brandon Dotson, and order their return to Brandon's next of kin;

    b.  Require that all tissues or organs obtained by Defendants without consent from the deceased or their family should be returned to family members, or, if not possible, they should be cremated and interred

properly;

    c.  Determine that if organs are disconnected from their records (and thus not possible to prove they were obtained with consent), they should be considered obtained without consent.

3. Awarding damages, compensatory, punitive and disgorgement of any profits from unlawful organ or tissue retention, to Plaintiffs against Defendants in an amount deemed appropriate by a jury and authorized by law;

4. Awarding to Plaintiffs reasonable attorney fees, costs and expenses under 42 U.S.C. §§ 1983 and 1988; and

5. Providing such other and further relief to Plaintiffs as the Court deems just and proper.

Submitted this 24th day of February, 2024.

<br>

Lauren Faraino, Esq.
ASB-8098-C65A
FARAINO, LLC
2647 Rocky Ridge Lane
Birmingham, AL 35216
T: 205.737.3171
E: lauren@farainollc.com

<br>

Michael G. Strickland, Esq.
ASB-3871-S63M
Strickland & Kendall, LLC

P.O. Box 99
Montgomery, AL 36106
mgs@jurytrial.us


_____

Dustin J. Fowler, Esq.
ASB-8960-S69F
Buntin, Etheredge & Fowler, LLC
P.O. Box 1193
Dothan, Al 36301
dustinjfowler@hotmail.com

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

_____

Lauren Faraino

## VERIFICATION OF COMPLAINT

I, attorney Lauren Faraino, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the factual allegations in the above Complaint are true and correct based on a reasonable belief supported by a reasonable investigation into the relevant witnesses and documents.

I am above the age of 18 and of sound mind, competent to make this statement. Executed on February 24, 2023.

_____

Lauren Faraino

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will electronically send notification of such filing to all counsel of record.

 

 

_____

Lauren Faraino